**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JUAN SYLVESTER BARNES | * | |
| Plaintiff | * | |
| v | * | Civil Action No. DKC-13-3142 |
| JANET RIDDICK, et al. | * | |
| Defendants | * | |
| | *** | |

## <u>MEMORANDUM OPINION</u>

Pending in this civil rights case is Defendants' Motion to Dismiss or for Summary Judgment. ECF 15. Plaintiff was advised of his right to file an Opposition Response and of the consequences of failing to do so, but has filed nothing opposing the motion. ECF 16. Also pending is Plaintiff's Motion for Recusal of the undersigned from this case. ECF 12. For the reasons set forth below, Defendants' motion, construed as a Motion for Summary Judgment, shall be granted and Plaintiff's Motion for Recusal shall be denied.

### Allegations in Complaint

Plaintiff Juan Sylvester Barnes ("Barnes") alleges that on December 14, 2012, he was transferred from a local county detention center to Maryland Reception Diagnostic Classification Center (MRDCC). On January 3, 2013, he was called to see a classification counselor, Defendant Janet Riddick ("Riddick"). He claims she spoke very quickly and would not slow down despite advising her that he is "slow" and needs more time to comprehend things. Riddick allegedly told Barnes, "well you understand how much time you have" and "there you have it." Barnes then informed Riddick he had enemies who were currently incarcerated in the Maryland Division of Correction (DOC) and provided her with two names: Cyril Williams and Andre Stevenson. Additionally, Barnes told Riddick he was a government informant and testified

against both Williams and Stevenson, who were both convicted in part because of his testimony. Barnes states that both Williams and Stevenson's names were noted on his "Enemy List Alert." ECF 1 at p. 1.

Subsequent to his meeting with Riddick, Barnes was transferred to North Branch Correctional Institution (NBCI) where he was assigned to "D tier." Upon his arrival on January 6, 2013, Barnes was placed in a cell with inmate David Wright. Barnes states that the tier was on lock-down because of a recent stabbing and cell searches were taking place. At some point during the cell searches, Wright walked over to the cell door and stated, "that's my man 'C.'" Barnes became concerned because he believed Wright was referring to Cyril Willaims, the man Barnes had testified against in a murder trial involving a state trooper. When Barnes went to the door to look, his suspicions were confirmed. ECF 1 at pp. 1 – 2.

Barnes told Wright about the history between himself and Williams. Wright advised Barnes to "get out of here" because if Williams saw Barnes he would retaliate against him for testifying against him at trial. Additionally, Wright advised that if word got out that Barnes was an informant his life would be in danger generally. During the conversation the cell door was opened and Barnes's name was called for "medical." Barnes claims when he walked out onto the tier he locked eyes with Cyril Williams, who smiled at Barnes and said, "got yo (sic) ass Mr. Barnes." ECF 1 at p. 2.

When Barnes arrived at the medical unit he states that the nurse could see he was visibly shaking and looked like he had been crying. He told staff that he had an enemy housed in the cell next to his, but was told he would be safe that night because there was no recreation for the tier at that time. Barnes wrote a request slip regarding the presence of Williams on his tier, but got no response that night. He states he wrote another request slip at an unspecified time and, in

order to protect himself, stayed in the cell under the bunk.   He stayed there until after his cellmate left the cell for recreation.  ECF 1 at pp. 2 – 3.

When Barnes' cellmate Wright, returned to the cell after recreation, he told Barnes that he had intervened with Cyril Williams on his behalf.   He claimed there was a plan to run into the cell where Barnes was and kill him, but Wright got Williams to abandon the plan if Barnes agreed to write a letter to the prosecutor for Williams's case apologizing for lying on the stand. Barnes was given 30 days to write the letter, have it notarized, and send it to the State's Attorney's office or he would "get chopped up."   Barnes claims he told Wright he could not write the letter because it would be perjury and Wright told him if he did not write the letter Barnes would be killed.  In addition, Wright told Barnes that Wright's life was now in jeopardy if Barnes did not sign the letter because he had vouched for him.  ECF 1 at p. 3.

Barnes states he never had a chance to get the letter notarized because on January 13, 2013, he was removed from his cell and told he would have to go on protective custody.   Barnes was told by case manager Zies that Barnes's mother, Betty Ransome, had called DOC headquarters to ask if Cyril Williams was in the same region as Barnes.  She based her inquiry on the fact that she had searched Williams's name on the DOC's website and it showed Williams and Barnes were at the same prison.  ECF 1 at p. 4.

In his court-ordered Amended Complaint, Barnes names as Defendants Felicia Hinton, the warden of MRDCC and Janet Riddick, the case manager who interviewed him at MRDCC. He states Hinton is responsible for the operation of MRDCC and the welfare of the inmates housed there and Riddick was responsible for calculating time of confinement and classifying inmates.  Barnes claims that Cyril Williams was listed as his enemy since December of 2010 and that "there is no way it could have been removed."   Barnes asserts he suffered emotional injury

as a result of being sent to the same prison as Williams and continues to suffer anxiety.  ECF 3 at

pp. 4 – 5.  As relief, Barnes seeks a permanent injunction prohibiting the DOC from housing him

with any of his known enemies as well as monetary damages.  ECF 1 at p. 4; ECF 3 at p. 6.

### Motion for Recusal

Barnes asserts this court has been unfair to him in prior litigation because an investigation

into his claims was not initiated by the court and the facts asserted were not construed in his

favor.  Additionally, he claims he has a learning disability which makes it difficult for him to

read.  He states this court was biased against him in one particular case concerning his claim that

police used excessive force against him and he takes issue with this court's findings of fact in

that case.  He claims a settlement hearing in another case where he was represented by counsel,

should have been transcribed because he was not present and adds that it is clear to him that the

undersigned does not like him.   He seeks to have all of his cases transferred to the United States

District Court for New York.  ECF 12.

Recusal is not appropriate under the circumstances. Pursuant to 28 U.S.C. § 144, recusal

can be considered whenever a party to any proceeding files a sufficient affidavit stating that the

judge before whom a case is assigned has a personal bias or prejudice either against that party or

in favor of another party. A motion for recusal must also be accompanied by a certificate of

counsel stating that the motion is made in good faith. Another section of the code, 28 U.S.C.§

455, requires a federal judge to recuse herself "in any proceeding in which h[er] impartiality

might reasonably be questioned." Any alleged bias "must stem from an extrajudicial source and

result in an opinion on the merits on some basis other than what the judge learned from h[er]

own participation in the case." *Shaw v. Martin*, 733 F.2d 304, 308 (4th Cir. 1984).  Barnes's

motion does not reveal a basis for recusal  and shall be denied.

**Motion to Dismiss or for Summary Judgment**

Counsel for the DOC asserts that the named Defendants, Hinton and Riddick, were not employed at MRDCC during the time Barnes was processed and transferred to NBCI.  Hinton was the warden at MRDCC from 2006 through 2009, and Riddick has never been employed at MRDCC.  ECF 15 at Ex. 1.  Notwithstanding the error in naming the improper parties,[1] counsel asserts that the assignment of Barnes to the same prison as Cyril Williams was not the result of a deliberate act and provides the following facts in support of that position.

Barnes and Williams have been imprisoned and released from the DOC on several occasions.  Each time they came back into the prison system they were committed under new identification numbers.  Barnes and Williams were listed as enemies on February 24, 2012.  During that incarceration Williams was assigned DOC identification number 337-621 and Barnes was assigned identification number 362-249.  Williams was released on March 23, 2012, and returned to the prison system under a new identification number (404-505) on May 24, 2012, and was assigned to NBCI on June 13, 2012. On December 14, 2012, when Barnes returned to the prison system, under a new identification number (409-797).   He  was assigned to NBCI on January 10, 2013, in Housing Unit (HU) 2-D-60-B.  At that time Williams, was housed in HU2-D-61-A, the cell next to Barnes's assigned cell.  ECF 15 at Ex. 2 (declaration of Charlotte Zies).

Case management has thirty days to complete a first assignment of new inmates. Enemies are checked at this point. When Barnes was re-incarcerated under identification number 409-797, the enemies listed under his previous identification number 362-249, which would include

---

[1]  Clearly the named Defendants are entitled to dismissal of the claims against them; however, this court is obliged to liberally construe self-represented pleadings.  *See Haines v. Kerner*, 404 U.S. 519, 521 (1972).  Additionally, "pleadings should not be scrutinized with such technical nicety that a meritorious claim should be defeated, and even if the claim is insufficient in substance, it may be amended to achieve justice." *Gordon v. Leeke*, 574 F. 2d 1147, 1151 (4th Cir. 1978) citing *Rice v. Olson*, 324 U.S. 786, 791-92 (1945); *Holiday v. Johnston*, 313 U.S. 342, 350 (1941).  To the extent the allegations raised may state a claim if raised against the proper parties, the merits of the claim shall be considered.

Williams, may not have been immediately reviewed. Barnes arrived at NBCI on January 10, 2013, and had his first assignment one week later on January 17, 2013. At that time, Williams was added to Barnes's enemy list, and Barnes was moved to Housing Unit 1 on Administrative Segregation status. Barnes was then transferred to Western Correctional Institution on January 31, 2013. *Id.*

### Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In undertaking this inquiry, this court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (U.S. 2009); *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50. On the other hand, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to

6

the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).  This Court has

previously explained that a "party cannot create a genuine dispute of material fact through mere

speculation or compilation of inferences." *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md.

2001) (citations omitted).

**Analysis**

Exhaustion of Administrative Remedies

The Prisoner Litigation Reform Act provides, in pertinent part:

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under
> section 1983 of this title, or any other Federal law, by a prisoner
> confined in any jail, prison, or other correctional facility until such
> administrative remedies as are available are exhausted.

42 U.S.C. §1997e.

As a prisoner, plaintiff is subject to the strict requirements of the exhaustion provisions.

It is of no consequence that plaintiff is aggrieved by a single occurrence, as opposed to a general

conditions of confinement claim.  *See Porter v. Nussle*, 534 U.S. 516, 528 (2002) (no distinction

is made with respect to exhaustion requirement between suits alleging unconstitutional

conditions and suits alleging unconstitutional conduct).  Exhaustion is also required even though

the relief sought is not attainable through resort to the administrative remedy procedure.  *See*

*Booth v. Churner*, 532 U.S. 731, 741 (2001).  A claim which has not been exhausted may not be

considered by this court.  *See Jones v. Bock*, 549 U.S. 199, 220 (2007).

Administrative remedies must, however, be available to the prisoner and this court is

"obligated to ensure that any defects in administrative exhaustion were not procured from the

action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th

Cir. 2007). The Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner,
> through no fault of his own, was prevented from availing himself of it. *See
> Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v.
> Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust
> all available remedies simply by failing to follow the required steps so that
> remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548
> U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner
> must have utilized all available remedies "in accordance with the applicable
> procedural rules," so that prison officials have been given an opportunity to
> address the claims administratively. *Id.* at 87. Having done that, a prisoner has
> exhausted his available remedies, even if prison employees do not respond. *See
> Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

*Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008).

Thus, plaintiff's claims must be dismissed, unless he can show that he has satisfied the

administrative exhaustion requirement under the PLRA or that defendants have forfeited their

right to raise non-exhaustion as a defense. *See Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md.

2003).   The PLRA's exhaustion requirement is designed so that prisoners pursue administrative

grievances until they receive a final denial of the claims, appealing through all available stages in

the administrative process. *Chase*, 286 F. Supp. 2d at 530; *Gibbs v. Bureau of Prisons*, 986 F.

Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust,

where plaintiff did not appeal his administrative claim through all four stages of the BOP's

grievance process); *Booth*, 532 U.S. at 735 (affirming dismissal of prisoner's claim for failure to

exhaust where he "never sought intermediate or full administrative review after prison authority

denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner

must appeal administrative rulings "to the highest possible administrative level"); *Pozo v.

McCaughtry*, 286 F. 3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps

to meet the exhaustion requirement, but need not seek judicial review).

Counsel asserts that Barnes has failed to exhaust administrative remedies regarding the claims asserted in the Complaint as amended.  ECF 15 at Ex. 3.  Barnes does not deny that he did not exhaust administrative remedies; rather, he asserts they were unavailable to him. ECF 3 at p. 2.  He claims in the verified Amended Complaint that he was assigned to administrative segregation and was not provided any forms to file administrative remedy procedure requests, but filed a "formal complaint."  *Id*.  There is no explanation or description provided for the formal complaint Barnes claims he filed.  *Id*.  Barnes's claim that he was not provided forms for purposes of filing an administrative remedy request is not unfamiliar to the court.  It is a frequent claim raised by prisoners within Maryland's DOC facilities and in particular NBCI.   Given that the evidence produced by Defendants entitles them to summary judgment and there is some evidence that administrative remedies were unavailable to Barnes, the court will reach the merits of the claims asserted.

### Failure to Protect

In order to prevail on an Eighth Amendment claim of failure to protect from violence, Plaintiff must establish that Defendants exhibited deliberate or callous indifference to a specific known risk of harm.  *See Pressly v. Hutto*, 816 F. 2d 977, 979 (4th Cir. 1987).  "Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penologicial objective, any more than it squares with evolving standards of decency.  Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society."  *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (citations omitted).  "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety, the official must both be aware of

facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, *see also Rich v. Bruce*, 129 F. 3d 336, 339-40 (4th Cir. 1997).

The evidence presented establishes that Barnes's assignment to a cell next to his known enemy was the result of negligence, not a deliberate or reckless disregard for his safety. The lack of malice is evidenced by the undisputed fact that once the mistake was realized, action was taken to quickly rectify the situation. Thus, even if Barnes had named the case manager involved with assigning him to NBCI or any other correctional official involved in his assignment, the claim would fail in light of the absence of any evidence that a prison official knew of the risks involved with moving him to NBCI and disregarded it. The Motion for Summary Judgment shall be granted by separate Order which follows.

\_August 15, 2014\_\_\_          _____/s/_____
Date                           DEBORAH K. CHASANOW
                                     United States District Judge